VLADECK, WALDMAN, ELIAS
  & ENGELHARD, P.C.
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300
Anne L. Clark (to be admitted pro hac vice)
Gregory S. Chiarello
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LESLIE E. JENKINS,                                          ECF CASE
                        Plaintiff,

                                                            13 Civ.
            - against -

MONTCLAIR STATE UNIVERSITY,                                 COMPLAINT

                        Defendant.                          JURY TRIAL DEMANDED
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Leslie E. Jenkins ("Jenkins" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Montclair State University ("MSU" or "defendant"), as follows:

NATURE OF THE ACTION

1.      Plaintiff brings this action to remedy MSU's interference with benefits and retaliation for the exercise of rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA") and the New Jersey Family Leave Act, N.J. Stat. Ann. § 34:11B-1 et seq. ("NJFLA"); to remedy violations under Section 1983 of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983 ("Section 1983"), for actions taken by defendant under color of state law to deprive plaintiff of her constitutional right to be free from race discrimination and retaliation, as prohibited by the federal constitution and laws, inter alia, 42 U.S.C. § 1981 and the

Equal Protection Clause of the Fourteenth Amendment; to remedy race discrimination and retaliation under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI"), and to remedy race and disability (including perceived disability) discrimination and retaliation and under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("NJLAD").

2.     MSU held Jenkins to a separate standard because of her race, assigning her the work of several employees in her role as Assistant Dean to the Dean of the College of Education and Human Services (the "College" or "CEHS") that required her to work long hours and weekends without adequate staffing support or additional compensation.  In contrast, Jenkins's non-African-American counterparts in CEHS enjoyed normal work hours and consistent access to support staff.

3.     MSU's discriminatory treatment of Jenkins escalated following her approved FMLA/NJFLA leave in late 2013 due to the death of her mother and her own stress-related health problems.  MSU subjected Jenkins to heightened scrutiny and false criticism of her performance and attendance, treatment MSU did not apply to Jenkins's White counterparts, or those who had not taken medical leave and/or were not perceived to have a disability.  Indeed, Jenkins's supervisor, the Dean of the CEHS Francine Peterman ("Peterman"), told Jenkins that she scrutinized her more heavily because of her leave of absence, and that she would not be recommending renewal of her contract.  Not surprisingly, MSU did not renew Jenkins's contract this year, even though it had done so every year prior.  Such blatant discrimination requires legal redress to the fullest extent.

4.     Plaintiff seeks injunctive and declaratory relief, damages, statutory penalties, and other appropriate legal and equitable relief pursuant to the FMLA, NJFLA, Section 1983, Title VI, and the NJLAD.

## PARTIES, JURISDICTION AND VENUE

5.     Plaintiff Jenkins is a citizen of the State of New Jersey. MSU has employed plaintiff since 1995.

6.     Defendant MSU, headquartered at 1 Normal Avenue, Montclair, Essex County, New Jersey, is a component of the New Jersey State College system. At all relevant times MSU employed more than 50 employees and satisfied the definition of "employer" under all applicable statutes.

7.     Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 29 U.S.C. § 2617. This Court has supplemental jurisdiction over plaintiff's NJLAD and NJFLA claims pursuant to 28 U.S.C. § 1367, because plaintiff's NJLAD and NJFLA claims closely relate to her federal claims, and arise from a common nucleus of operative facts such that they form part of the same case or controversy.

8.     On July 7, 2014, Jenkins filed a charge of discrimination against MSU with the United States Equal Opportunity Employment Commission (the "EEOC"). Plaintiff intends to request a notice of right to sue. When plaintiff receives the notice of her right to sue from the EEOC, she will seek to amend the Complaint to add race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and to add claims of disability (including perceived disability) discrimination and retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the

"ADA").  The facts set forth below support those claims as well, and therefore, there will be no prejudice to defendant by this procedure.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant regularly conducts business, and substantial part of the events or omissions giving rise to the claim occurred, within the District of New Jersey.

## FACTUAL ALLEGATIONS

### Background

10.     Jenkins is an African-American woman.

11.     MSU hired Jenkins in October 1995 as the Assistant Dean, School of Professional Studies.  In November 1995, MSU restructured its schools and MSU renamed the School of Professional Studies the College of Education and Human Services.

12.     The CEHS Dean from Jenkins hire to 2000 was Nicholas Michelli.  In 2000, Dr. Ada Beth Cutler ("Cutler"), who is White, replaced Michelli.

13.     Assistant Deans generally work between the hours of 8:30 a.m. and 4:30 p.m.; however, due to her workload Jenkins often worked 10 or 11 hour days, well past 4:30, and on weekends as well.

14.     The Assistant Dean position is a management position.  MSU classifies Assistant and Associate Deans, including Jenkins, as overtime exempt employees and does not pay them overtime pay for the additional hours they work.

15.     Historically, MSU has permitted Assistant and Associate Deans, including Jenkins, to work flexible schedules beyond the regular 8:30 to 4:30 workday.  For example, if Jenkins needed to work late on a project or event, MSU permitted her to arrive to work later than 8:30 the next morning.  MSU also permitted specific work arrangements where employees

worked extra hours in the work week to off-set absences for regularly-scheduled appointments. Until 2014, Jenkins operated under this policy without reprimand or comment from the Dean.

16.     In each of 2012 and 2013, Jenkins worked at least 1250 hours and otherwise was eligible for FMLA and NJFLA leave during all relevant periods.

<u>Jenkins Is Singled Out to Handle an Excessive Workload</u>

17.     Since her hire in 1995, Jenkins has had responsibility for several areas within the College that elsewhere are treated as separate jobs, including: budgets (State appropriation, revenue and Foundation accounts, accounting, course fees); facilities (new construction projects, renovations, deferred and general maintenance, space utilization, security); personnel (faculty and staff searches, equity in salaries, position ranges and job descriptions, performance evaluations, professional development, timesheet approvals); student services (student conduct, grade grievances, recruitment, advising); technology (hardware and software, website development and maintenance, database development); enrollment management; marketing; legal (affiliation agreements, contracts and memoranda of understanding ("MOU's")); and events planning (Convocation, Annual Awards Ceremony, recruitment events).

18.     As MSU grew in size over Jenkins's tenure, many of her responsibilities grew in size as well, such that the number of tasks she performed for each function increased over time.

19.     On information and belief, other MSU Assistant Deans were not required to carry such extensive and heavy workloads.

20.     For most of her employment, Jenkins's only support staff was her secretary who at times was absent for up to five months due to illness. Jenkins often performed her job without support staff or with a per diem employee who MSU would discharge once

616384 v1

5

Jenkins's secretary returned. MSU and Cutler routinely denied Jenkins's requests for additional and higher-level support staff. As a result, for the majority of her employment Jenkins acted as secretary, support staff, and Assistant Dean all at once, with a workload that comprised three or more separate management jobs.

21. Upon information and belief, no other management employee at MSU, let alone at the College of Education and Human Services, is responsible for the same number of roles as Jenkins, or is required to perform his or her job with so little support.

22. In 2006, Jenkins developed fibromyalgia, a musculoskeletal condition that causes fatigue and pain. Jenkins still experiences symptoms of fibromyalgia to this day, which can be brought on and/or exacerbated by stress or overworking.

23. Through emails and other communications, Cutler was aware of Jenkins's health condition.

<u>Race Discrimination at MSU</u>

24. The CEHS Dean is supported by approximately nine managers. Since October 1995, the only African-American to have held a management position in CEHS other than Jenkins has been the Executive Director for the Center for Pedagogy, who joined in approximately 2005.

25. Despite repeated requests over the years for additional and permanent support staff to assist Jenkins with her many job roles, Cutler and MSU have denied her requests on each occasion.

26. Since 2009 or earlier, other managers and professional staff in the Dean's Office, including the Associate Deans, all of whom are not African-American, have had permanent full-time administrative support above the level of secretary, and/or were assigned

Graduate Assistants. In contrast, Jenkins, for her entire tenure until May 2012, has had only temporary and secretarial staff; in May 2012, MSU briefly allowed Jenkins to have a Program Assistant, but reassigned the Assistant less than a year later to a newly-hired White employee who handled a fraction of Jenkins's workload.

27. MSU permitted two White CEHS Associate Deans to hire a Program Assistant in 2009. MSU even permitted White professional staff members (who are not managers) to hire part-time Program Assistants beginning in 2006.

28. In contrast, in 2002, when Jenkins reclassified her assigned secretary position to Program Assistant, Cutler told Jenkins to revert the position to a secretarial role. Cutler told Jenkins that she could not reclass her secretarial position because it would make Cutler's White secretary "feel bad."

29. On another occasion, Cutler rejected Jenkins's proposal to share a secretary and Program Assistant with an Associate Dean in order to have additional support.

30. Until recently, Jenkins's responsibilities included overseeing the Facilities Department ("Facilities"). Facilities is responsible for, among other functions, campus maintenance. Until Jenkins complained in 2006, Cutler insisted that Jenkins go on service calls, including to oversee issues with clogged toilets, view scuff marks on floors, and examine tape residue from postings on building doors. Those functions, which Jenkins found demeaning, fell outside the scope of Jenkins's role and should have been handled directly by a Facilities employee, not Jenkins.

31. In March 2012, Jenkins attended a Dean's meeting with Cutler and two Associate Deans, Tamara Lucas ("Lucas") and Kim O'Halloran ("O'Halloran"), all of whom are White. Near the conclusion of the meeting, in a presentation concerning work with Facilities,

7

Jenkins referred to the Facilities Department as "they." Cutler interrupted and said, "they?" in a mock-Black dialect. She then asked Jenkins in the same mock-Black dialect to whom "they" referred. Jenkins paused in disbelief before answering and continuing the presentation; Lucas and O'Halloran stared ahead without speaking.

32.   Jenkins reported the incident to HR soon after. Upon information and belief, HR did not investigate Jenkins's complaint or take action against Cutler.

33.   In June 2012, Cutler stepped down from her role as Dean of the College of Education and Human Services, but remained on staff as a professor. MSU replaced Cutler with Peterman, who is White. Upon information and belief, during the transition Cutler spoke to Peterman about Jenkins, including discussing Jenkins's medical condition.

### MSU's Differential Treatment of Jenkins Continues Under Dean Peterman

34.   At the time Peterman began in mid-2012, Jenkins still handled many functions within the College of Education and Human Services, including: budgets, facilities, personnel, student concerns, affiliation agreements, contracts and MOU's, Convocation, and the annual Awards Ceremony.

35.   From the start, Peterman applied heightened scrutiny to Jenkins's work that she did not apply to non-African-American managers in the office.

36.   Peterman often spoke to Jenkins in a harsh and belittling tone, but did not speak that way to non-African-American employees in the office. For example, Peterman frequently accused Jenkins of unsubstantiated performance faults. Typically, Jenkins would explain the situation to Peterman, who would then apologize to Jenkins. Peterman did not treat the non-African-American employees in her office in the same "guilty-until-proven-innocent" manner.

37.     On one occasion, Peterman publicly reprimanded Jenkins for not providing her with budget spreadsheets she had requested.  Jenkins explained to Peterman that she was waiting for input from the College chairs and that she would provide the spreadsheets as soon as they were ready.  Peterman apologized, and said "I'm always attacking, but I only do that to you.  I don't know why. Maybe it's because you do the budgets."  Jenkins always prepared CEHS budgets consistent with MSU protocol.

38.     On nights Jenkins worked late, Peterman on occasion would come to Jenkins's office to talk.  In those conversations, Peterman told Jenkins that "our arrangement is not working out for her," and then would talk about how easily she had fired three Associate and/or Assistant Deans at Queens College, her prior employer.  Jenkins understood Peterman's comments to be thinly-veiled threats to fire her.

39.     In the Spring of 2013, The City University of New York ("CUNY") awarded Jenkins a five-year fellowship in their doctoral program.  Jenkins applied for a personal leave from MSU to attend the program  full time, which Peterman approved for September 2013 to June 2014.  During that period, Jenkins would work a half-time schedule, at half salary.

40.     Jenkins requested permission to use accrued leave time (such as earned vacation days) to increase her salary while on half-time.  Peterman denied Jenkins's request, citing the need to use Jenkins's unused salary to compensate employees assuming the other half of Jenkins's workload.

41.     In the Fall of 2013, Jenkins began a 10-credit course schedule and also continued to work at least 17 1/2 hours a week at MSU.

42.     In September 2013, Peterman and Jenkins discussed redistributing some of Jenkins's responsibilities elsewhere in CEHS.

9

43.     That same month, Peterman reassigned Jenkins's Facilities responsibilities to Pamela Scully ("Scully"), the Director of Technology Services, who is White.   Although Scully manages only two areas, Facilities and Technology, she has two full-time employees to assist her in addition to four per diem employees for Technology and a part-time Program Assistant for her Facilities work.  Scully reports to O'Halloran, Jenkins's peer.  On information and belief, MSU gave Scully additional compensation for her expanded role managing Facilities.

44.     Jenkins did not receive additional compensation for any of the additional functions she managed, including Facilities. When Jenkins managed Facilities, she did so along with approximately five to six other major responsibilities and with minimal, inconsistent support from only one secretary or per diem employee.

45.     In September 2013, Peterman also assigned Jenkins's budget responsibilities to a newly-hired Budget Manager, Julie Kossoy ("Kossoy"), who is White. Peterman relocated Jenkins's to an office on the second floor, below the Dean's suite, in order to make room for Kossoy in the Dean's suite on the third floor.   One of the Associate Deans moved into Jenkins's old office.

46.     Peterman also reassigned Jenkins's full-time Program Assistant, Winsome Wynter ("Wynter") (who had worked for Jenkins less than a year), to Kossoy, even though Kossoy was new and had not established a need for a Program Assistant; Kossoy performed a small fraction of Jenkins's total duties.  MSU had granted Jenkins a Program Assistant only after nearly 18 years of persistent requests.

<u>Jenkins Is Punished for Taking FMLA/NJFLA Leave</u>

47.     In June 2013, Jenkins's mother was diagnosed with terminal pancreatic cancer.  Jenkins's mother then received intensive home and hospital care that required Jenkins to

visit or stay with her mother several times a week. The physical, emotional, and mental toll on Jenkins was considerable.

48.     By October 2013, Jenkins's mother's condition had become critical. Jenkins requested leave under the NJFLA and FMLA to take care of her mother, and FMLA leave for her own stress related to Peterman's harassment and her mother's deteriorating health. Jenkins received approval to begin her leave on November 1, 2013. Peterman was aware of Jenkins's request for FMLA/NJFLA leave and MSU's approval of the leave. Peterman also was aware of the basis for Jenkins's requested leave, which included aggravated symptoms of her fibromyalgia.

49.     A few days before her leave began, Jenkins reminded Peterman that she anticipated returning to work in early January 2014. Peterman responded that, "if you are not going to do your work when you return, then don't come back."

50.     Jenkins began her leave on November 1, 2013; her mother passed away one week later. Jenkins used MSU bereavement leave for the period between November 8 and 14, 2013.

51.     Jenkins resumed FMLA leave for her personal condition on November 15, 2013. She ended her FMLA leave on December 31, 2013 and used vacation time for the period between January 1, 2014 and January 13, 2014.

52.     Jenkins canceled her half-time status to attend school as of January 1, 2014.

53.     In December 2013, while Jenkins still was on FMLA leave, Peterman revised Jenkins's job description, removing her advisory responsibilities for Health and

Nutritional Sciences, expanding her Student Services responsibilities, and adding Alumni Relations and Personnel to her functions.

<u>Peterman's Excessive and Unwarranted Scrutiny of Jenkins's Attendance</u>

54.     In December 2013, while Jenkins still was on FMLA leave, Peterman sent Jenkins an email directing her, upon her return to work, to begin reporting her daily attendance to Peterman's administrative assistant.

55.     Other managers that supported the CEHS Dean – who were non-African-American, did not have a disability (or perceived disability), and/or who had not recently returned from FMLA/NJFLA leave – did not have to report their attendance to Peterman, even if they were located in an office outside of the Dean's suite.

56.     Peterman later admitted to Jenkins that she was the only manager in the College that Peterman required to report her attendance.  Peterman acknowledged that Jenkins's attendance during her mother's illness and her subsequent leave was the basis for this unique requirement.

57.     On Jenkins's second day back from leave, January 14, 2014, Peterman accused Jenkins of submitting inaccurate time records.  She stated that Jenkins's attendance in November 2013 was inconsistent with her timesheets.  Jenkins reminded Peterman that she had been out on approved NJFLA and FMLA leave in November, and that HR had handled her timesheets for that period.

58.     Peterman did not respond to Jenkins's explanation, but instead stated that, in any event, Jenkins had poor attendance during the Fall semester generally.  Jenkins reminded Peterman that her mother had been dying of pancreatic cancer and that she had to make a number

of emergency trips to the hospital since her mother's diagnosis in June 2013. Jenkins had always called in to the office when she needed to be out, and used accrued leave time for her absences.

59. Finally, Peterman claimed that there were "inconsistencies" in Jenkins's reporting of absences during the fall semester. When Jenkins asked for specific incidents, Peterman could not provide any.

60. Peterman also told Jenkins at the January 14, 2014 meeting that her performance over the past nine months did not warrant reappointment in the following year. Jenkins, however, had been occupied for much of that period with caring for her dying mother or was on FMLA/NJFLA leave.

61. In February 2014, Jenkins filed a complaint of race discrimination with Human Resources ("HR") concerning Peterman's treatment of her. To date, the investigation has not been completed and no corrective action has been taken.

62. Prior to filing the HR complaint, Jenkins sent Peterman an email on or about January 27, 2014 stating that she planned to report Peterman's harassing and retaliatory treatment to HR.

63. Peterman did not provide Jenkins with a list of alleged "inconsistent" attendance dates until Jenkins notified Peterman of her intent to file a complaint. Peterman's list, sent by email, identified four minor recording errors, 4-5 months old, which, under the general MSU practice of allowing managers to work flexible schedules, should not have been an issue. Moreover, Peterman had approved the timesheets when Jenkins had submitted them in the first instance, several months prior.

64. Peterman's email also referred to a "pattern of late arrivals" from the previous year, but acknowledged that the alleged late arrivals were not documented.

65.     On information and belief, Peterman did not reprimand other managers – who were non-African-American, did not have a disability (or perceived disability), and/or who had not recently returned from FMLA/NJFLA leave – who made use of MSU's flexible scheduling policy, or scrutinize every absence in their attendance record.

66.     On January 28, 2014, Peterman met with Jenkins and told her that she had concerns about Jenkins's attendance, task completion, and communication.  Peterman directed Jenkins to submit bi-weekly logs to document her job tasks for the week, her completion of those tasks, and her timely communication with individuals related to her work.

67.     On January 30, 2014, Peterman asked Jenkins to complete a five month plan with a timeline for completing a series of outlined tasks.  Peterman required weekly plans for the tasks Jenkins intended to accomplish.  Peterman told Jenkins to keep daily logs and provide bi-weekly plans on her progress on those tasks, including identifying meetings attended, paperwork handled and created, and accomplishment of specific tasks.  In addition, Peterman scheduled bi-weekly meetings with Jenkins to discuss her work.

68.     As a result of Peterman's new requirements, Jenkins frequently reported to or met with Peterman to discuss her work.  Peterman's excessive supervision often disrupted Jenkins's regular work.  Jenkins was the only CEHS employee that Peterman scrutinized to such a severe a degree.

69.     Peterman began assigning special projects to Jenkins in addition to her full workload.  Peterman's assignments were considered priority assignments to be completed before Jenkins's regular work, often causing Jenkins to fall behind.  Jenkins believes Peterman's assignments were part of a campaign to overload her with work so that she would fail.

70.     On information and belief, other managers under Peterman – who were not African-American, did not have or were not perceived to have a disability, and/or had not taken FMLA/NJFLA leave since 2012 – did not receive the same scrutiny or criticism that Peterman applied to Jenkins.

<u>Additional Acts of Discrimination and Retaliation Following Jenkins's Leave</u>

71.     Shortly after Jenkins returned to work in January 2014, Peterman asked Wynter, Jenkins's former Program Assistant, to update the list of chairs and advisors for the Convocation program, a clerical task requiring information in Jenkins's possession.  In an email to Wynter and the other Assistant/Associate Deans, Peterman thanked Wynter for "jumping in," but that Wynter should be comfortable "delegat[ing] responsibilities to others," meaning Jenkins, even though Peterman had assigned the work to Wynter in the first instance.  Wynter's position, Program Assistant, is a support position well below Jenkins's position; indeed, Jenkins had hired Wynter in 2011.  Peterman's email publicly demeaned and embarrassed Jenkins.

72.     On February 12, 2014, Peterman stopped in Jenkins's office and asked to reschedule a meeting scheduled for later in the week to that day.  When Jenkins told Peterman she could not meet that day, Peterman began to berate Jenkins and told her that her performance since returning from FMLA leave on January 14 was inadequate.  When Jenkins told Peterman that Peterman's constant criticism created a hostile work environment for her, Peterman told Jenkins to "buck up" and speak with Employee Assistance.

73.     Prior to her return from FMLA leave, Jenkins told Peterman that she would need to leave at 2:30 on Mondays to commute to her doctorate program class.  Jenkins told Peterman that she could make up the time by coming in early and staying late the other days of the week, pursuant to MSU practice.  Peterman rejected Jenkins's proposal and told her she

616384 v1

15

needed to use vacation for her commuting time. Peterman also told Jenkins that her workday began at 8:30 and ended at 4:30, even though Jenkins was not a non-exempt employee and rarely left the office before 6:00 p.m.

74. In August 2013, Peterman, under the mistaken belief that Jenkins held a special Master Key to the CEHS building, directed Jenkins to forfeit the key to her. At the time, Jenkins explained that she, Peterman, and the Associate Deans had the same key, which provided access only to CEHS spaces. Jenkins referred Peterman to Facilities for access to locations she could not enter; Peterman appeared satisfied with Jenkins's response. However, six months later, in February 2014, notwithstanding Jenkins's earlier explanation Peterman again asked Jenkins to forfeit her Master Key and berated her for not turning over the key when she initially had asked.

75. In April 2014, Peterman falsely accused Jenkins of assigning CEHS scholarship-related work to Wynter without Kossoy's permission. Peterman maintained her accusation even though Jenkins and Wynter both denied that Jenkins had assigned Wynter any scholarship-related work.

76. MSU provided Peterman and O'Halloran with subscriptions to a news listserv; among other functions, the Dean's office used the listserv to monitor alumni in the news. Due to cost, MSU did not provide Jenkins with a subscription to the listserv. Instead, as arranged by Peterman, she or O'Halloran forwarded relevant news items to Jenkins.

77. In an April 2014 bi-weekly meeting, Peterman berated Jenkins for not being on the listserv and instructed her to join. Peterman then directed Jenkins to write the directive in her notes, as if she was a schoolchild.

Jenkins's 2014 Performance Evaluation and Reappointment Recommendation

78.    On April 11, 2014, Peterman provided Jenkins with her Managerial Performance Evaluation and Reappointment Recommendation for July 1, 2014 – June 30, 2015 ("Recommendation"); essentially, Jenkins's annual performance review.

79.    In the Recommendation, Peterman provided unwarranted criticism of Jenkins's performance.  For example, Peterman criticized Jenkins for failing to complete tasks on time.  However, most of the uncompleted tasks were caused by Peterman's harassment or the additional reporting and supervision Peterman required of Jenkins.

80.    Peterman also harped on seemingly unimportant events.  For example, Peterman criticized Jenkins for asking students in an Undergraduate Student Advisory Committee meeting a question on a subject that was not on the meeting's agenda.  This benign and unremarkable event purportedly led Peterman to conclude that she needed to take responsibility for the Committee away from Jenkins, which she did.

81.    Many of Peterman's criticisms were false.   In the Recommendation, Peterman accused Jenkins of commencing a College project to tape alumni testimonials for a recruitment video by scheduling an interview of an alumna without Peterman's permission. Peterman's accusation was completely inaccurate.  An employee from University Advancement, Corina Slackman, offered to check the alumna's schedule for a possible interview for the recruitment project.  Jenkins agreed, but took no steps to schedule the interview or a videotaping session.  O'Halloran and Jenkins postponed the alumni project shortly after Slackman's offer.

82.    Peterman's final recommendation in the 2013 evaluation was that Jenkins not be reappointed as Assistant Dean in the College of Education and Human Services, just as Peterman had stated to Jenkins upon her return from FMLA/NJFLA leave in January 2014.

83.     Jenkins's performance evaluations in her prior 18 years all had been positive and had been accompanied by a recommendation to extend her employment contract.

84.     MSU's and Peterman's conduct toward Jenkins has caused her considerable stress, which has negatively affected her health.  Due to stress related symptoms and aggravated fibromyalgia caused by Peterman's actions, Jenkins requested and was approved for FMLA leave, which commenced in April 2014.

85.     In late April or early May 2014, Peterman sent HR an email requesting that Jenkins be charged for 157.5 hours of personal time taken between September and December 2013.  However, HR already had deducted any personal time for Jenkins's absences during that period, which occurred immediately prior to Jenkins's first FMLA leave.  Moreover, Jenkins did not need to use personal time for Peterman's alleged absences because Jenkins was on half-time status during that time and was not paid while she was out.

86.     After Jenkins challenged Peterman's deduction request, Peterman acknowledged that she had been mistaken.  Peterman claimed that she had not realized Jenkins had been on half-time status between September and December 2013, even though she had approved Jenkins's half-time status and had denied Jenkins's request to use leave time to supplement her hours during that period.

87.     Based on Peterman's recommendation, MSU did not renew Jenkins's contract.  Her employment ended as of June 30, 2014.

88.     Upon information and belief, Kossoy, who has been employed less than a year, has not performed well.  Rather than recommending that Kossoy's contract not be renewed, Peterman placed Kossoy on a six month performance probation.  Upon information and belief, Kossoy resigned and agreed to work as a per diem employee after June 30, 2014.

## FIRST CAUSE OF ACTION

## FMLA

89.     Plaintiff repeats and realleges  paragraphs 1 through 88 of this Complaint as if set forth fully herein.

90.     By the acts and practices described, the MSU interfered with, restrained, and denied plaintiff her rights under the FMLA, and discriminated and retaliated against plaintiff for exercising her rights under the FMLA, in violation of the FMLA, 29 U.S.C. §§ 2612, 2614, and 2615.

91.     MSU knew that its actions violated the FMLA and/or MSU's actions were not made in good faith.

92.     As a result of MSU's discriminatory and retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

## NJFLA

93.     Plaintiff repeats and realleges  paragraphs 1 through 92 of this Complaint as if set forth fully herein.

94.     By the acts and practices described, the MSU retaliated against plaintiff for exercising her rights under the NJFLA, in violation of the N.J. Stat. Ann. § 34:11B-1 et seq.

95.     MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

616384 v1

96. As a result of MSU's retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

### THIRD CAUSE OF ACTION

#### Section 1983: Race Discrimination

97. Plaintiff repeats and realleges paragraphs 1 through 96 of this Complaint as if set forth fully herein.

98. By the acts and practices described, MSU, acting under color of state law, violated Jenkins's rights under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, by discriminating against plaintiff on the basis of her race, in violation of Section 1983.

99. MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

100. As a result of MSU's discriminatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION

#### Section 1983: Retaliation

101. Plaintiff repeats and realleges paragraphs 1 through 100 of this Complaint as if set forth fully herein.

102. By the acts and practices described, MSU, acting under color of state law, retaliated against plaintiff for her opposition to conduct that violated her rights under 42 U.S.C. §

1981 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in violation of Section 1983.

103.    MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

104.    As a result of MSU's retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

### FIFTH CAUSE OF ACTION

### TITLE VI: Race Discrimination

105.    Plaintiff repeats and realleges paragraphs 1 through 104 of this Complaint as if set forth fully herein.

106.    By the acts and practices described, MSU, a program or activity receiving federal financial assistance, discriminated against plaintiff and deprived her of her rights under the law based on her race, in violation of Title VI.

107.    MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

108.    As a result of MSU's retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

616384 v1

## SIXTH CAUSE OF ACTION

### Title VI: Retaliation

109.    Plaintiff repeats and realleges paragraphs 1through 108 of this Complaint as if set forth fully herein.

110.    By the acts and practices described, MSU, a program or activity receiving federal financial assistance, retaliated against plaintiff and deprived her of her rights under the law for opposition to unlawful employment practices, in violation of Title VI.

111.    MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

112.    As a result of MSU's retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief

## SEVENTH CAUSE OF ACTION

### NJLAD: Race and Disability Discrimination

113.    Plaintiff repeats and realleges paragraphs 1 to 112 of this Complaint as if fully set forth herein.

114.    By the acts and practices described, MSU discriminated against plaintiff in the terms, conditions and privileges of her employment on the basis of her race and/or disability (including perceived disability) in violation of the NJLAD.

115.    MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

116.    As a result of MSU's discriminatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish,

emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION

### NJLAD: Retaliation

117.    Plaintiff repeats and realleges paragraphs 1 to 116 of this Complaint as if fully set forth herein.

118.    By the acts and practices described, MSU retaliated against plaintiff in the terms, conditions and privileges of her employment for her opposition to unlawful practices in violation of the NJLAD.

119.    MSU acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

120.    As a result of MSU's retaliatory acts, Jenkins has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)    declaring that defendant's conduct complained of herein violates plaintiff's rights under the FMLA, NJFLA, Section 1983, Title VI, and the NJLAD;

(b)    enjoining and permanently restraining defendant from violating he FMLA, NJFLA, Section 1983, Title VI, and the NJLAD;

(c)    directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendant to instate plaintiff to the position that she would have occupied had she not been subject to discrimination and retaliation;

(e)     directing defendant to make plaintiff whole for all earnings and other benefits she would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages and other lost benefits;

(f)     directing defendant to pay plaintiff compensatory damages for her mental anguish and humiliation and damage to reputation;

(g)     directing defendant to pay plaintiff punitive damages for its intentional disregard of and/or reckless indifference to plaintiff's statutory rights;

(h)     directing defendant to pay plaintiff liquidated damages pursuant to 29 U.S.C. § 2617(a).

(i)     directing defendant to pay plaintiff's attorneys' fees, costs and disbursements;

(j)     directing defendant to compensate plaintiff for any adverse tax consequences;

(k)     directing defendant to pay prejudgment interest; and

(l)     granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
      July 11, 2014

                         VLADECK, WALDMAN, ELIAS &
                           ENGELHARD, P.C.

By:   */s/  Gregory S. Chiarello*
       Anne L. Clark (to be admitted <u>pro</u> <u>hac</u> <u>vice</u>)
       Gregory S. Chiarello
       Attorneys for Plaintiff
       1501 Broadway, Suite 800
       New York, New York 10036
       (212) 403-7300

616384 v1